## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

    v.

AHMARRAE STANLEY BROOKS,

    Defendant.

Criminal Action No. TDC-22-0428

### MEMORANDUM OPINION

Defendant Ahmarrae Stanley Brooks has been charged with federal firearms and drug trafficking offenses arising out of a June 27, 2022 warrantless search of his vehicle conducted in the parking lot of the Capital Crossing Apartments ("Capital Crossing") in Suitland, Maryland. Pending before the Court is Brooks's Motion to Suppress, in which Brooks seeks suppression of the firearm, ammunition, and controlled substances seized from his vehicle during the search. After the Motion was fully briefed, the Court held an evidentiary hearing on the Motion on May 16, 2023. For the reasons set forth below, the Motion will be GRANTED.

### BACKGROUND

The following facts were established at the evidentiary hearing from the testimony of Corporal Christopher Fulda and Sergeant James Davis of the Prince George's County Police Department ("PGCPD") and the exhibits admitted as evidence, including video recordings from body cameras and police cruiser cameras. On June 27, 2022 at approximately 10:27 p.m., Cpl. Fulda, Sgt. Davis, Cpl. Meushaw, and other PGCPD officers were proactively patrolling areas of Prince George's County, Maryland as part of the PGCPD Criminal Activity Suppression Team ("CAST"). The officers were traveling in a caravan of at least three police vehicles and entered

Capital Crossing, an apartment complex that is located in an area known to the officers to be a statistically high crime area in which shootings, robberies, and drug activity occur. As a result of such activity, the apartment complex has periodically requested police patrols of the premises.

The officers entered Capital Crossing through an entrance on the 3900 block of Suitland Road in Suitland, Maryland. Upon turning off of Suitland Road, which is a public road, the officers drove on Stone Gate Drive, a private road accessible only from Suitland Road which runs through the apartment complex.

While driving on Stone Gate Drive, Cpl. Fulda, who was in the lead police vehicle, observed to his right a silver Honda Accord backed into a parking space, with the front of the vehicle facing out toward Stone Gate Drive. The parking space was in a private parking lot which was designated for the use of Capital Crossing residents and their visitors only, as reflected on posted tow-away zone signs. Cpl. Fulda observed that the vehicle's headlights were on, which caused him to believe that the car may be in operation, but he did not hear the engine running, see exhaust coming from the tailpipe, or hear music or noise coming from the radio.

As he passed the vehicle, Cpl. Fulda saw that someone, later identified as Brooks, was sitting in the driver's seat. He also saw that the side windows and windshield of the vehicle were very darkly tinted, and that the vehicle did not have a front license plate. After Cpl. Fulda had driven past Brooks's car, he stopped his police cruiser, radioed the other officers about Brooks's car, and directed them to stop Brooks and ask whether he was staying at the apartment complex and what business he had there.

Sgt. Davis, who was in the second police vehicle in the caravan, stopped directly in front of the Accord and thus blocked it in. While still in his police vehicle, Sgt. Davis shone his flashlight into the front windshield of the Accord, and observed Brooks "moving around a lot" in

2

his seat. Hrg. Tr. at 73. Specifically, Sgt. Davis saw Brooks's right shoulder "going down" as if he was "reaching towards the floorboard," *id.* at 73, 75, which Sgt. Davis interpreted as an attempt to "retrieve or conceal something." *Id.* at 73. Sgt. Davis also observed that Brooks's vehicle did not have a front license plate and that the windows were darkly tinted. He then activated the lights on his police vehicle to notify Brooks that he was conducting a traffic stop.

Sgt. Davis and Cpl. Meushaw, who had been in another police vehicle in the caravan, both exited their vehicles and approached the driver's side of the Accord. At this point, the headlights on the Accord had been turned off. Brooks had opened the driver's side door and placed one foot outside of the vehicle, but Sgt. Davis and Cpl. Meushaw, while still some distance from the Accord, ordered him to stay in the vehicle, with Sgt. Davis stating, "Woah, woah, woah. Uh, uh, uh" to signify that Brooks should not move or step out of the vehicle entirely. Sgt. Davis Body Cam Video at 0:30–0:33, Hrg. Ex. 3A.

Once they reached the driver's side door, Cpl. Meushaw asked for Brooks's license and registration. Through the open car door, Sgt. Davis observed a large bag of what he believed to be crack cocaine on the floorboard of the vehicle and alerted Cpl. Meushaw to the drugs. Having drawn his taser, Sgt. Davis pointed it at Brooks and ordered him, "Uh, uh. Don't move. There's a huge amount of crack right there on the floor. Don't move, don't move, I will light you up, man. Don't move." Hrg. Tr. at 75; Sgt. Davis Body Cam Video at 0:40–0:46. Cpl. Meushaw then placed Brooks under arrest.

At the same time, Cpl. Fulda had exited his police vehicle and approached the passenger side of the Accord. As he opened the door, and as Sgt. Davis was stating that he observed crack cocaine in the vehicle, Cpl. Fulda smelled the odor of marijuana coming from the Accord. At the time that the officers arrived at the Accord, the keys were not in the ignition. The Accord also had

3

a visitor parking permit for Capital Crossing hanging from the rearview mirror. Up to that point, although there was open space behind the Accord, none of the officers had approached the rear of the Accord to determine whether it had a rear license plate.

The officers then conducted a full search of the vehicle and seized a loaded Glock handgun located behind the center console, a separate magazine with additional ammunition, multiple baggies of suspected crack cocaine found on the driver's side floorboard, multiple baggies of suspected marijuana, a digital scale, and sandwich bags.

During the search, the officers also tested Brooks's window tints. Cpl. Fulda measured the tint levels on the front driver's side window and the windshield and found that the side window tint measured at 6 percent and the front windshield window tint measured at 32 percent. Cpl. Fulda also observed that the front windshield displayed tint below the "AS1 line," a horizontal line near the top of the windshield. Hrg. Tr. at 27–28. These measurements all would establish violations of Maryland's window tint laws, which prohibit the operation on a public highway of a Maryland-registered vehicle with a side window tint below 35 percent, a front window tint above the AS1 line of below 35 percent, or a window tint of any kind below the AS1 line. Md. Code Ann., Transp. §§ 22–406(i)(1), (i)(4)(iv) (West 2017).

After the stop was initiated, officers observed a temporary Georgia license plate on the back of the Accord. An officer provided a description of the Accord and its license plate number by radio, and at some point Cpl. Fulda walked to the rear of the vehicle and confirmed that it had such a temporary license plate.

On December 14, 2022, a federal grand jury returned the Indictment against Brooks charging him with one count of Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1); one count of Possession with Intent to Distribute Controlled Substances, in violation

4

of 21 U.S.C. § 841(a)(1) and (b)(1)(B); and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).

### DISCUSSION

In his Motion to Suppress, Brooks argues that the evidence was seized in violation of the Fourth Amendment to the United States Constitution because the warrantless stop of Brooks was not supported by reasonable suspicion of criminal activity or a traffic violation. The Government counters that officers had reasonable suspicion to stop Brooks based on Brooks's furtive movements in a high crime area, the Accord's lack of a front registration plate, and the vehicle's window tints, and that, even if the Court finds that officers did not have reasonable suspicion to conduct the stop, the Court should apply the good faith exception of *Davis v. United States*, 564 U.S. 229, 241 (2011).

### I.    Legal Standards

Under the Fourth Amendment to the United States Constitution, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  Generally, evidence obtained during a search or seizure conducted in violation of the Fourth Amendment is to be excluded at trial pursuant to the exclusionary rule. *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014).

Consistent with the Fourth Amendment, law enforcements officers may conduct a brief investigatory stop of an individual or vehicle if they have a reasonable, articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  A traffic stop constitutes an investigatory seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Under the Fourth Amendment, police officers may conduct a traffic stop if they

observe conduct that establishes either probable cause or reasonable suspicion to believe that a traffic violation has occurred. *See United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013).

## II.     The Stop

The parties agree that the officers conducted an investigatory stop or traffic stop under the Fourth Amendment. They agree that the officers first acted to effectuate the stop when Sgt. Davis, having stopped his police vehicle in a location that blocked the Accord from moving forward, activated his police lights to signal his intent to stop Brooks, and they agree that the stop actually occurred when Sgt. Davis, as he exited his vehicle, first directed Brooks not to move by stating "Woah, woah, woah. Uh, uh, uh," and Brooks complied by refraining from fully stepping out of the vehicle. *See California v. Hodari D.*, 499 U.S. 621, 628–20 (1991) (finding that a stop occurs when the suspect submits to a show of authority).

The Government therefore argues that the following facts obtained before the stop occurred established reasonable suspicion of criminal activity or a traffic violation: (1) Brooks's furtive movements in a high crime area; (2) the lack of a front registration plate; and (3) the dark window tinting on the Accord.

## III.     Suspected Criminal Activity

The Government argues that the stop was justified because the officers had a reasonable suspicion of criminal activity based on Sgt. Davis's observation of Brooks engaging in furtive movements in a high crime area. Specifically, the Government relies on the testimony that Capital Crossing is located in a high crime area, and that the CAST patrol on the night in question occurred in part because the apartment complex had, at times, requested that PGCPD conduct patrols there because of the high level of crime in the area. The fact that an investigatory stop "took place at night in a high-crime area is a relevant factor in the totality of the circumstances analysis," but it

6

is "not itself sufficient" to establish reasonable suspicion. *United States v. Cloud*, 994 F.3d 233, 248 (4th Cir. 2021). Indeed, the United States Court of Appeals for the Fourth Circuit has cautioned that because "the demographics of those who reside in high crime neighborhoods often consist of racial minorities and individuals disadvantaged by their social and economic circumstances . . . [t]o conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people." *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013). Notably, in the present case, there was no request to investigate any particular suspicious activity at Capital Crossing on the night in question. The Government thus focuses on the furtive movements, which as described by Sgt. Davis, consisted of Brooks "moving around a lot" in his seat and "reaching towards the floorboard" in a manner consistent with attempting to retrieve or conceal something. Hrg. Tr. at 73, 75. The officers also observed that at the time of the stop, Brooks had opened the driver's side door and put one foot on the ground outside of the vehicle. In assessing reasonable suspicion, "nervous or evasive behavior" by the suspect and "suspicious movements" may be considered, and the Court must consider whether multiple factors considered together establish reasonable suspicion even if each factor taken alone would not. *See United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013).

Here, even considering that they occurred in a high crime area at night, the Court finds that Brooks's furtive movements of moving around in his seat and of reaching down to the floorboard of the car do not establish reasonable suspicion of criminal activity. The available videos show the length of time that Sgt. Davis shone his flashlight on the Accord as he observed Brooks lasted no more than eight seconds, so the furtive movements could not have been particularly extensive. Sgt. Davis described only a single reach toward the floor of the car, and while the Government has

argued that Brooks attempted to flee from the officers, the video recordings reveal that Brooks never exited the vehicle, had only opened the door and put one foot on the ground, and that he made no further movements after ordered by the officers not to do so.

These movements are not sufficiently incriminating to meet the standard of reasonable suspicion. In *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011), a law enforcement officer conducted an investigatory stop of a stationary vehicle in which the defendant and another individual were seated based on the defendant's sudden appearance from a crouched position after his companion saw the detective approaching the car; the defendant's "frenzied" arm movements, including reaching down toward the floorboard of the car, which suggested that he was trying to hide something; and the officer's knowledge that the defendant had a criminal record and was under some kind of investigation. *Id.* at 246–47. Even with this knowledge of the defendant's criminal history, the court held that these facts did not establish reasonable suspicion to support an investigatory stop, particularly where the defendant did not flee upon seeing the officers. *See id.* Here, the furtive movements by Brooks are comparable to those at issue in *Foster*—arm movements toward the floorboard of the car which could be construed as an attempt to hide something—and, as noted in *Foster*, such movements are consistent with numerous innocent explanations, such as bending over to retrieve a dropped item. *Id.* at 247. There was no clear attempt to flee, and unlike in *Foster*, the officers had no knowledge that Brooks had a criminal record or was under investigation.

Similarly, in *United States v. Sprinkle*, 106 F.3d 614 (4th Cir. 1997), the court found no reasonable suspicion to support an investigatory stop even though the officer observed the defendant, who was known to have been convicted of a drug offense, in a vehicle in a high crime area engaging in the suspicious movement of being "huddled toward the center console" with

8

another suspect "with their hands close together," which gave an officer the impression that the parties were in the midst of a narcotics transaction. *Id.* at 617. Further, the defendant, upon seeing the officer, raised his hand to the side of his face to conceal his identity, and the vehicle then drove away in an unhurried fashion. *Id.* at 618. Here, the movements by Brooks were no more suspicious than those in *Sprinkle*, and the officers did not have any information on whether Brooks had a criminal record. Under *Foster* and *Sprinkle*, the Court finds that Brooks's actions, even in a high crime area, did not provide reasonable suspicion of criminal activity.

Notably, the Government cites no controlling authority supporting a finding of reasonable suspicion based on the type of limited furtive movements present here. The unpublished cases involving furtive movements upon which the Government relies include additional, more incriminating facts not present in this case. *See, e.g., United States v. Spearman*, 254 F. App'x 178, 180, 182 (4th Cir. 2007) (finding that officers had reasonable suspicion to stop a defendant who engaged in "furtive movements under the driver's seat" in part because the officers had also been told by a confidential source conducting an undercover drug buy that drugs could be purchased from the defendant's car, and the driver of the car was believed to be a known armed drug dealer); *United States v. Brown*, 578 F. App'x 195, 197 (4th Cir. 2014) (finding that officers had reasonable suspicion to stop a defendant where the defendant appeared to be loitering outside a store after midnight and examining his surroundings, as if "about to effect a robbery," then drove away when a police car was visible, and his post-stop furtive movements helped to justify a frisk for a weapon). Accordingly, the Court finds that Brooks's furtive movements in a high crime area did not give rise to reasonable suspicion to stop him. *Foster*, 634 F.3d at 246–47; *Sprinkle*, 106 F.3d at 618.

## IV.     Motor Vehicle Violations

Where the facts were insufficient to establish reasonable suspicion of criminal activity that would justify a *Terry* stop, the Government must rely on the argument that the facts demonstrated reasonable suspicion of a motor vehicle or traffic violation, consisting of the lack of a front license plate and the dark window tinting. The Court will discuss these factors individually and together. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

### A.     Front License Plate

As to the lack of a front license plate, under Maryland law, standard passenger vehicles registered in Maryland generally are required to display two license plates, one at the front of the vehicle and one at the rear. Md. Code Ann., Transp. §§ 13–410, 13–411(a). However, the lack of a front license plate does not necessarily establish a violation of motor vehicle or traffic laws. Certain vehicles registered in Maryland are not required to have two license plates, such as vehicles that have a temporary registration. *See id.* §§ 13–410, 13–411(b) (permitting only one license plate for temporarily registered vehicles, motorcycles, tractors, trailers, historic vehicles, and street rods). Furthermore, approximately 19 states do not require two license plates, and under Maryland law, vehicles validly registered in states that do not require two license plates are not required to display two license plates while operating in Maryland. *Id.* § 13–402.1(a).

Thus, the fact that a vehicle lacks a front license plate plainly does not by itself support reasonable suspicion of a motor vehicle violation. To so conclude would lead to the absurd result that every vehicle registered in a state that does not require two license plates would be subject to a traffic stop whenever and wherever it is found in Maryland. Even as a factor to be considered among others, the lack of such a plate has very little probative value because there are so many vehicles that are not required to display two license plates. Here, at the time of the incident, the

10

Accord had a valid, temporary registration issued by Georgia, a state which does not require two license plates. Ga. Code Ann., Motor Vehicles & Traffic § 40–2–41 (West 2015). To the extent that officers might assume that a vehicle encountered in Maryland is registered in Maryland, a check of the rear of the vehicle is all that is required to confirm that it is a vehicle with a permanent Maryland registration, and not one with a temporary registration or a registration from a state that does not require two license plates, so as to support the conclusion that the vehicle is in violation of a Maryland traffic law. Notably, the video recordings clearly establish that the rear of the Accord, which was parked, was fully accessible had the officers decided to check the rear license plate before conducting a traffic stop, and the Georgia temporary registration tag was clearly visible. Thus, the Court finds that the lack of a front license plate did not alone justify the traffic stop and was of extremely limited value to the establishment of reasonable suspicion.

**B.    Window Tinting**

Upon encountering the Accord, Cpl. Fulda immediately recognized that the window tinting was particularly dark. Under Maryland law, "a person may not operate a vehicle" registered in Maryland "on a highway in this State" if, as to a passenger vehicle, "there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%." Md. Code Ann., Transp. §§ 22–406(i)(1)(i); 13–912(a). Therefore, "if a police officer observes that a vehicle is being operated in violation" of this provision, "the officer may stop the driver of the vehicle and, in addition to a citation charging the driver with the offense, issue to the driver a safety equipment repair order." *Id.* § 22–406(i)(2). Further, the same statute provides that no tinting materials may be "added to the windshield of a vehicle below the AS1 line or below 5 inches from the top of the windshield."

*Id.* § 22–406(i)(4)(iv). Notably, these requirements apply only to vehicles registered in the state of Maryland. *See id.* § 22–406(i)(1).

Here, Cpl. Fulda correctly judged that the window tints on the Accord were sufficiently dark that they would violate the limits set by Maryland law for Maryland-registered vehicles. After the search of the vehicle, the officers used a device to confirm that the tint on the side window measured at 6 percent, and the front windshield was tinted at 32 percent, both below the established limits. The darkness of the windows, however, did not necessarily justify a traffic stop for two reasons.

### 1.  Operation on a Highway

First, under the plain language of the statute, the window tint law applies only to the operation of a vehicle on a "highway" in Maryland. *Id.* The parties agree that this term includes only public streets, roads, or highways, and that Stone Gate Drive was not such a highway. *See* Md. Code Ann., Transp. § 11–127(1) (defining "highway" for purposes of the "Vehicle Laws" title of the Transportation Article as "the entire width between the boundary lines of any way or thoroughfare of which any part is used by the public for vehicular travel, whether or not the way or thoroughfare has been dedicated to the public and accepted by any proper authority"); *United States v. Williams*, No. PWG-19-0134, 2019 WL 4415540, at *4–5 (D. Md. Sept. 16, 2019) (finding that, under this definition and the relevant facts, a private roadway within a private apartment complex that led only to the apartments and its parking spots and had restrictive signage was not a "highway" for purposes of Maryland vehicle laws). Furthermore, an officer must "observe" that the vehicle is being operated on a highway in violation of the law in order to have authorization to stop that vehicle. Md. Code Ann., Transp. § 22–406(i)(2). Here, the officers did not observe Brooks operating the vehicle at all, much less on a highway. Rather, the officers

observed Brooks sitting in the vehicle while it was parked in the parking lot of a private apartment complex, located on a private road, and not "between the boundary lines" of any road. Md. Code Ann., Transp. § 11–127(1). Although the headlights were on when the officers first observed the vehicle, there were no other signs that the vehicle had been or would soon be driven. None of the officers heard the engine running, there was no exhaust visibly exiting the exhaust pipe, and neither the windshield wipers nor the radio were operating. By the time the officers actually approached the vehicle, the headlights were off and the key was not in the ignition. Moreover, the Accord was found in a private residential parking lot in a private apartment complex, with signs stating that unauthorized vehicles would be towed, and it had a Capital Crossing visitor parking permit. Even if the vehicle was driven out of the parking lot, it still would have had to be driven down the private road some distance before reaching Suitland Road, a public highway. None of the officers saw the vehicle move, much less operate on that road. Under the plain language of the statute, the officers did not observe the operation of the Accord on a highway, as is required for a stop to issue a citation. *Id.*

In *United States v. Sanders*, 954 F.2d 227 (4th Cir. 1992), the Fourth Circuit recognized this distinction by holding that when law enforcement officers stopped and arrested a defendant after he backed out of a parking space in a private residential parking lot, they lacked probable cause to arrest him for operating an uninsured vehicle, driving with an expired registration, and driving with an improper license plate because the car had not been driven on a public road, as was required by the relevant state laws. *Id.* at 229–30. Although *Sanders* involved the higher standard of probable cause to arrest, rather than reasonable suspicion, the court's finding that under the circumstances, the officers "lacked any evidence" that the vehicle had been driven on a public road is equally instructive here because it demonstrates that the presence of a car in a private apartment

13

complex parking lot, even one that was being driven in that parking lot, does not provide evidence that it was driven on a public road or highway. *Id.* at 230. Thus, *Sanders* refutes the Government's argument that the presence of the Accord in a private parking lot adjacent to a private road that runs to a public highway provides some evidence that the vehicle must have been operated on such a highway.

The Government has cited no persuasive authority for the proposition that, contrary to the plain implication of *Sanders*, the encountering of a vehicle in a private apartment complex's parking lot could establish reasonable suspicion of a violation of a motor vehicle law requiring operation on a highway. Although the Government has identified several cases in which the court found reasonable suspicion of a moving violation when the officers did not observe the individual actually driving on a public highway, those stops occurred on or immediately adjacent to a public road where the car necessarily must have been driven on the public road shortly before the stop, not in a private residential parking lot located on a private road, and there were additional indicia that the individual was operating the vehicle, such as the fact that the engine was running. *See United States v. Junkins*, 860 F. App'x 297, 303 (4th Cir. 2001) (finding that, although officers did not observe the defendant operating the vehicle, they had reasonable suspicion to stop the defendant for an expired registration where the car was parked in the parking lot of a convenience store on a public highway and the vehicle's engine was running); *United States v. Stewart*, 149 F. Supp. 2d 236, 241–43 & n.15 (E.D. Va. 2001) (finding that officers had reasonable suspicion to stop an individual for violating state window tinting laws in the parking lot of a public library because the lot could be considered a public highway under Virginia law, the officers had seen the defendant driving the car in the parking lot, and the vehicle's engine was still running); *Williams*, 2019 WL 4415540, at *8 (finding that officers had reasonable suspicion to stop the defendant for

14

defective tail lights where the stop occurred as the defendant was driving the car on a private road that led to a public road).  Accordingly, the Court finds that, where the state statute prohibited operating a vehicle on a highway with certain window tint levels, the officers did not have reasonable suspicion to support a traffic stop where they encountered the Accord parked in a private residential parking lot located on a private road, particularly when they did not observe it in operation and the engine was not running. *See Sanders*, 954 F.2d at 229–30.  *Cf. United States v. Gore*, No. RBH-12-0057, 2012 WL 1621007, at *2 (D.S.C. May 9, 2012) (finding that a law enforcement officer did not have reasonable suspicion to stop the defendant for a suspected violation of a traffic law barring the parking of unattended cars on a public highway where the officer observed the defendant park his unattended car in a private parking lot).

### 2.    Out-of-State Vehicle

Even if the Court were to find that the lack of operation of the vehicle on a highway did not preclude a traffic stop based on the window tinting, the stop was also flawed because the window tint law applies only to vehicles registered in the state of Maryland. *See* Md. Code Ann., Transp. § 22–406(i)(1).  The parties dispute whether the officers had the authority to stop an out-of-state car for a suspected violation of Maryland's window tint laws.  This particular issue has been addressed by both the Fourth Circuit and the Maryland Court of Special Appeals.  In *United States v. Johnson*, 256 F.3d 214 (4th Cir. 2001), the defendant, a Georgia resident operating a vehicle registered in Georgia, was pulled over on an interstate highway in South Carolina because the state trooper "couldn't see anything in the car" and the "back window was black," in apparent violation of South Carolina's window tinting laws, which, like the Maryland law, requires operation of the vehicle on a public road and applies only to vehicles required to be registered in South Carolina. *Id.* at 215–16.  After the stop, the officer, through the use of a drug sniffing dog,

discovered two kilograms of cocaine in the trunk of the car. *Id.* After the district court denied a motion to suppress the drugs, the Fourth Circuit reversed, rejected the Government's argument that the officer "did not need reasonable suspicion regarding the registration element," and held that "[w]ithout reasonable suspicion to believe that Johnson's car was required to be registered in South Carolina, [the officer] had no reasonable suspicion of unlawful conduct, because it is not unlawful under South Carolina law for a vehicle traveling on a public highway to have a noncompliant sunscreen device unless the vehicle is also required to be registered in South Carolina." *Id.* at 217. Thus, under *Johnson*, a law enforcement officer must have reasonable suspicion to believe that a vehicle is required to be registered in Maryland in order to have reasonable suspicion to stop that vehicle for a violation of the Maryland window tint law. *See id.* Here, the officers had no reason to believe that Brooks's vehicle was registered in Maryland or required to be registered in Maryland. Indeed, the fact that the Accord did not have a front license plate gave officers reason to believe that the vehicle was not required to be registered in Maryland, because the most straightforward explanation for that fact would be that it was an out-of-state vehicle. To the extent that the officers did not know whether or not the vehicle was required to be registered in Maryland, the officers had ample opportunity to inspect the rear of Brooks's vehicle for a license plate before conducting the stop.

The Government, however, relies on a contrary decision by the Maryland Court of Special Appeals in *Baez v. State*, 192 A.3d 945 (Md. Ct. Spec. App. 2018). In *Baez*, the defendant, operating a vehicle registered in Virginia, was pulled over by law enforcement officers in Maryland on the basis that the car's windows were tinted too darkly in apparent violation of the Maryland law. *Id.* at 947. During the stop, law enforcement officers smelled the odor of marijuana, the defendant acknowledged that he had marijuana in the car, and a search ultimately

16

uncovered marijuana. *Id.* The Court of Special Appeals affirmed the denial of a motion to suppress based on the conclusions that the investigatory stop was based on the tinted windows and that the fact that the "vehicle was registered in Virginia did not preclude the police officer from stopping" it "to investigate further and to ascertain where the vehicle was registered." *Id.* at 950. The court did not determine, or consider to be dispositive, when the officer actually learned that the vehicle was registered in Virginia before conducting the stop. *Id.*

*Johnson* and *Baez* provide conflicting and contradictory holdings on the same question: whether an officer may stop a vehicle for a violation of window tint laws applicable only to in-state vehicles without a reasonable suspicion that the vehicle is registered or required to be registered in that state. Although the parties have sought to draw distinctions, none are meaningful. The reality is that *Baez*'s holding that the fact that "[t]hat the vehicle was registered in Virginia did not preclude the police officer from stopping [the] vehicle to investigate further," *Baez*, 192 A.3d at 950, is not reconcilable with *Johnson*'s holding that the stop was not justified "[w]ithout reasonable suspicion to believe that [the] car was required to be registered in South Carolina," *Johnson*, 256 F.3d at 217. Because this Court is bound by Fourth Circuit precedent, the Court applies the holding of *Johnson*, a published, on-point opinion issued by the Fourth Circuit. *See id.* But see *United States v. Devonta Johnson*, No. PWG-21-0171, 2021 WL 5882570, at *1 (D. Md. Dec. 13, 2021) (applying *Baez* and finding that officers had reasonable suspicion to stop a vehicle with darkly tinted windows that was displaying a temporary Virginia license plate to determine whether or not it was validly registered in Virginia).

Although the Government argues that the present case is distinguishable because the officers had not yet seen the temporary Georgia license plate before they conducted the stop, that claim is unconvincing because the opinion in *Johnson* does not demonstrate that the officer

17

observed the defendant's out-of-state license plate before conducting the stop, *Johnson*, 256 F.3d at 215, and in fact the district court record provides a basis to conclude that he did not. Joint Appendix 11, ECF No. 27-1. Moreover, the video recording in the present case shows that the officers had the opportunity to check the license plate before conducting the stop, and to uphold the stop based on the failure to obtain this readily available information would create a perverse incentive to refrain from checking the rear license plate, a step routinely conducted in most traffic stops, in order to justify a more intrusive investigatory stop. Accordingly, the Court finds that under *Johnson*, the officers lacked reasonable suspicion to justify the traffic stop based on the window tinting because they had no facts supporting a reasonable suspicion that the vehicle was or was required to be registered in Maryland. *See Johnson*, 256 F.3d at 217.

### 3. Unsafe Operation

The Government also argues that the window tinting justified the stop because it rendered the vehicle unsafe, in violation of section 22–101(a)(1) of the Transportation Article of the Maryland Code. Md. Code Ann., Transp. § 22–101(a)(1). Under that statute, "a person may not drive and the owner may not cause or knowingly permit to be driven on any highway any vehicle" that (i) "[i]s in such unsafe condition as to endanger any person"; (ii) "[d]oes not contain those parts or is not at all times equipped with lamps or other equipment in proper condition and adjustment" as required by a state motor vehicle law; or (iii) "[i]s "equipped in any manner" in violation of a state motor vehicle law. *Id.* Notably, this statute also requires that a person drive the vehicle on a "highway," the same term used in the window tinting statute. *See id.* at §§ 22–101(a)(1). As discussed above, the officers did not have evidence that Brooks had operated the Accord on such a highway. *See supra* part IV.B.1.

18

Moreover, although the Government argues that the front windshield tint was necessarily unsafe because it would be illegal in all 50 states and violates the Federal Motor Vehicle Safety Standard No. 205, the Government has not cited any authority establishing that operating a vehicle with a tinted windshield, or other tinted windows, constitutes unsafe operation within the meaning of the Maryland Unsafe Vehicle Law. Finally, the claim that the tinting poses a safety threat to officers when they approach a vehicle to conduct a traffic stop, even if true, does not relate to the safe operation of the vehicle. The Court thus finds no basis to uphold the stop based on the Maryland Unsafe Vehicle Law.

## V.      Totality of the Circumstances

Although the various facts relating to alleged criminal activity and alleged traffic violations do not separately support the investigatory stop, the Court must consider them in combination. *Sokolow*, 490 U.S. at 8. The Court does not find that the alleged furtive movements in a high crime area, when combined with the window tint and lack of a front license plate, provide the requisite reasonable suspicion. The furtive movements provide no basis to increase the likelihood that the license plate and window tinting issues amounted to a traffic violation. Likewise, as discussed above, the lack of a front license plate is so likely to be lawful that it does not bolster the allegations of criminal activity, and if anything it makes the window tinting violation less likely because it increases the likelihood that the vehicle was registered out-of-state. Finally, although the Government has argued that window tinting presents a danger to officers when they are conducting a traffic stop, it has offered no argument or basis to conclude that the window tinting somehow decisively tipped the facts in favor of a finding of reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. Thus, considering the totality of the circumstances, the Court finds that the officers did not have reasonable suspicion to stop Brooks.

19

## VI.    Good Faith Exception

The Government contends that, even if the stop was unlawful, the Court should decline to suppress the evidence obtained during the subsequent search based on the good faith exception to the exclusionary rule. Under the good faith exception, the exclusionary rule does not apply if: (1) law enforcement officers acted in good faith reliance on a facially valid warrant, *United States v. Leon*, 468 U.S. 897, 920–21 (1984); or (2) "binding appellate precedent specifically authorizes" the "particular police practice," and the action was taken in "reasonable reliance" on such precedent, *Davis*, 564 U.S. at 241. Here, although the Government does not claim that the officers in question had any actual knowledge of the Court of Special Appeals' opinion in *Baez* or specifically relied upon it, it argues that the stop should be upheld because *Baez* constitutes binding appellate precedent that justifies their conduct. *See Archers Glen Partners, Inc. v. Garner*, 933 A.2d 405, 424 (Md. Ct. Spec. App. 2007) (finding that a reported opinion of the Maryland Court of Special Appeals constitutes binding precedent).

As discussed above, however, the relevant holding of *Baez* conflicts with the Fourth Circuit's holding in *Johnson*. The Fourth Circuit has generally applied the *Davis* good faith exception based on binding appellate precedent only where there is an "established and uniform body of precedent" permitting the action in question. *United States v. Aigbekaen*, 943 F.3d 713, 725 (4th Cir. 2019); *United States v. Kolsuz*, 890 F.3d 133, 148 (4th Cir. 2018). Indeed, the *Davis* good faith exception is most typically applied where law enforcement relied on undisputed, binding appellate precedent in effect at the time of the police action in question that was later overturned by the United States Supreme Court or the relevant United States Court of Appeals. *See, e.g., United States v. Wilks*, 647 F.3d 520, 522, 524 (4th Cir. 2011) (applying the good faith exception where the law enforcement officer acted in good faith reliance on binding Fourth Circuit

20

precedent permitting the search of the passenger compartment of an automobile as part of a search incident to arrest that was later overruled by the Supreme Court).

The Court is unaware of a circumstance in which the *Davis* good faith exception was applied when the binding appellate precedent was not uniform and instead was conflicting and contradictory. Although the Government cites *United States v. Stephens*, 764 F.3d 327 (4th Cir. 2014), in that instance the court found that a decision of the Maryland Court of Appeals could constitute binding appellate precedent for the purposes of the good faith exception, but neither the Supreme Court nor the Fourth Circuit had addressed the issue in question, much less issued a conflicting or contradictory opinion. *Id.* at 338. In addressing an argument to apply the *Davis* good faith exception when there were arguable conflicts in relevant state and federal precedent, the United States Court of Appeals for the Ninth Circuit declined to apply the good faith exception in part because "a conflict between the state appellate court and the Ninth Circuit with respect to a question in a case that could be brought to either court can hardly be thought to result in 'binding appellate precedent.'" *United States v. Lara*, 815 F.3d 605, 614 (9th Cir. 2016). While the Government argues that the officers in question were state or local officers, not federal agents, and thus should be held only to binding state appellate precedent, where the Government so frequently prosecutes in federal court cases investigated by local police departments, particularly the PGCPD, the Court will not conclude that PGCPD officers need not consider or follow the binding precedent of the Fourth Circuit. Thus, where *Baez* conflicts with the Fourth Circuit's holding in *Johnson*, the Court concludes that the *Davis* good faith exception does not apply.

## CONCLUSION

For the foregoing reasons, the Motion to Suppress will be GRANTED.  A separate Order shall issue.

Date:  June 23, 2023

THEODORE D. CHUANG
United States District Judge